Procter & Gamble Company, Plaintiff, *v.* Peters, White & Company, Defendant.

First Department, May 2, 1919.

**Sale — contract for present sale of oil to be produced by seller construed — conversion by factor — when title passes.**

A corporation engaged in the production of fish oil entered into a contract providing that it " hereby sells " and the purchaser " buys " from it " all the Menhadden Fish Oil to be produced " at its plant from the date of the contract to a certain date, except a certain number of barrels which its agent has an option to take under a prior agreement. The purchaser was to receive the oil in tank cars to be supplied by it at the factory or at its option in barrels to be furnished by it. The oil was to be invoiced to the purchaser by the agent of the seller " as and when " it was produced at the factory, and thereupon said agent was to be entitled to draw at sight to its own order upon the purchaser for the oil at a certain rate per gallon. Prior to the contract by the seller with the agent giving it a sole and exclusive agency, the seller had constituted another its factor for the exclusive right to sell its fish oil during the years in question, and upon making the contract of sale notified the factor that collections should pass through its hands as theretofore. The agent exercised its option to purchase part of the oil to which it was entitled. The oil after it was extracted at the seller's plant was allowed to remain in settling tanks until it became clear and then was pumped into storage tanks from which it was pumped out for shipment. The factor procured the seller to have shipments of oil consigned to its order and delivered to another company from which said factor received payment, and with respect to two of said shipments the purchaser under the aforesaid contract furnished its own cars as contemplated and the oil was delivered therein. In an action by the purchaser against the factor for conversion, provisions of the contract and evidence examined, and

*Held*, that there was a conversion of the two cars of oil, and that the
  defendant with a full knowledge of the plaintiff's title participated
  therein;

That it was the intention of the parties that title was to pass when the
  oil was pumped into the storage tanks.

SMITH, J., dissented in part, with opinion.

MOTION by plaintiff, Procter & Gamble Company, for a
new trial upon a case containing exceptions, ordered to be heard
at the Appellate Division in the first instance after the direction
of a verdict in defendant's favor by the court at the close of the
case upon a trial before the court and a jury at the New York
Trial Term in November, 1918.

*Eugene Lamb Richards* of counsel [*Rutherford B. Meyer*
with him on the brief], for the plaintiff, for the motion.

*Clarke M. Rosecrantz* of counsel [*Eustace Seligman* with him
on the brief: *Sullivan & Cromwell*, attorneys], for the defendant,
opposed.

LAUGHLIN, J.:

The plaintiff, a corporation duly organized and existing
under the laws of Ohio, brought this action against the defend-
ant, a domestic corporation, for the conversion of fish oil,
at Promised Land, N. Y., between the 1st day of August and
the 15th day of September, 1914. The answer is a general
denial. The plaintiff claimed title and the right to the
possession of the oil by virtue of an agreement, in writing,
made between it and the Atlantic Phosphate and Oil Com-
pany, which was a domestic corporation, and which, for the
sake of brevity, will be referred to as the seller, on the 29th day
of January, 1914. The seller had a plant at Promised Land,
L. I., for extracting oil from fish, and it conducted the business
of catching fish, unsuitable for human consumption, and of
extracting the oil therefrom and selling the refuse as fertilizer.
It was not a contract to purchase in the future for it expressly
provided that the " seller hereby sells " and the purchaser
" buys " from it " all the Menhaden fish oil * * * to be pro-
duced " at said plant, from the date of the contract to the thirty-
first day of December thereafter " except six thousand (6,000)

barrels, or such part thereof as Marden, Orth & Hastings Company shall take under agreement " between it and the seller, dated the 15th day of December, 1913, and the plaintiff agreed to pay for the oil as thereinafter provided. On the subject of the delivery of the oil, which is one of the principal points in the case, the contract provided that the purchaser should receive the oil in tank cars to be supplied by it at the factory, or, at its option, in barrels to be furnished by it at the factory; that the purchaser was to provide enough tank cars or barrels at the factory to take and receive the oil " as and when produced by the seller, except as hereinafter provided; " that the oil should be invoiced to the purchaser by said Marden, Orth & Hastings Company, as agent for the seller " as and when " the oil was produced at the factory, and that thereupon said agent should be entitled to draw, at sight to its own order, upon the purchaser for the oil, at the rate of twenty-five cents per gallon; that if, at any time, there should not be at the factory sufficient tank cars or barrels furnished by the purchaser " to receive all the oil as fast as produced " the seller should store the oil in its own tanks at the factory and its agent should invoice the oil as soon as so stored to the purchaser and should be entitled, thereupon, to draw upon the purchaser the same as with respect to the oil delivered into tank cars or barrels, and in the event that the oil so stored in the seller's tanks should reach the amount of 15,000 barrels, and the purchaser should not provide sufficient tank cars or barrels " to take care of all excess as fast as produced," the seller was to be at liberty to " ship such excess oil to the purchaser or store the same in any way that may be possible," and in that event the purchaser agreed to pay the seller any extra expenses thus incurred. Provisions were then made for weighing and testing the oil on its receipt at the purchaser's factory in Cincinnati in order to determine the correctness of the invoices as to quantity and to determine whether the oil shipped was of the quality specified in the contract, and thereafter the final payment of the purchase price, to be determined as therein provided either by the purchaser's election to take f. o. b. cars at Promised Land at thirty cents per gallon or by the current market prices at Baltimore, was to be made. By the agreement between the

oil company and the Marden, Orth & Hastings Company, referred to in the contract between the seller and the plaintiff, the seller appointed the Marden, Orth & Hastings Company its sole and exclusive agent for the sale of all the fish oil offered for sale or produced by it or, by any one controlled by it, during one year from the date thereof, and the agent was given the option to take oil for its own account to the extent of 6,000 barrels, and the agent agreed to lend to the seller its credit, in the form of promissory notes, to the extent of $50,000. The agency, which the contract between the seller and the plaintiff contemplated should be exercised by the Marden, Orth & Hastings Company, was not exercised by that company but in part was exercised by the defendant. It was not shown, however, whether that contract of agency was terminated by mutual consent or otherwise. The evidence shows that the Marden, Orth & Hastings Company exercised its option to purchase part of the oil but not to the extent of 6,000 barrels and that it received the oil to the extent that it exercised the option. It does not appear when it exercised the option but it is fairly to be inferred from the evidence that its exercise in no manner related to or affected the oil claimed to have been converted by the defendant.

Prior to the making of the contract with Marden, Orth & Hastings Company, and on May 1, 1913, the seller had constituted the defendant its factor for the exclusive right to sell its fish oil during the years 1913–1914, and the day after it made the contract with the plaintiff it notified the defendant that the collections for its oil for the year 1914 should pass through the defendant's hands as theretofore. The defendant claims that it was not aware of the terms of the contract between the seller and the plaintiff. The evidence shows, however, that the defendant was aware of the pendency of the negotiations leading up to the execution of that contract and was consulted by the seller with respect thereto and that the contract was exhibited to its vice-president shortly before execution and in the form in which it was executed. The vice-president of the defendant did not deny that he examined the contract when it was so exhibited to him with sufficient care to ascertain plaintiff's rights thereunder; and the correspondence between the seller and the defendant before the

alleged conversion tends to show that defendant knew that the plaintiff had purchased all Menhaden fish oil of that grade to be manufactured that season by the seller subject only to said option for 6,000 barrels. The first draft drawn by the seller on the plaintiff, under the contract, through the defendant was a time draft for thirty days for an advance payment of $25,000 to be made to the seller under the contract, and was drawn on the 30th day of January, 1914, and was discounted by the defendant. On the 9th day of May, 1914, the defendant wrote the seller asking whether it had notified the plaintiff of the defendant's relations " as regards the deal made with them in oil," and as to whether the plaintiff had been instructed that all payments were to go through the defendant's office, and on the eleventh day of May the seller acknowledged the letter and inclosed copies of letters sent to the plaintiff to cover the suggestion made by the defendant, which on the next day the defendant acknowledged to be satisfactory. Numerous drafts drawn by the seller on the plaintiff passed through the defendant's hands, and it discounted those of them which were time drafts. The process of extracting oil at the plant was shown and it appears that after it is allowed to remain in settling tanks until it becomes clear, it is pumped into storage tanks from which it is pumped out for shipment. When a shipment was to be made the seller filled out an order for a bill of lading on forms furnished by the carrier, specifying, among other things, to whose order the consignment was to be made, the destination, who was to be notified, and a description of the property and the name of the shipper, and on the presentation of that and the delivery of the oil to the carrier, the bill of lading was filled out and delivered to the shipper. On the 17th of July, 1914, the defendant wrote the seller stating that it understood that by the form in which the oil had been shipped theretofore the plaintiff could get the cars without awaiting the arrival of the bills of lading with drafts annexed, and it inclosed forms of orders for bills of lading, and requested that they be used in the future, and that the goods be shipped in the defendant's name and to its order, and stated in effect that otherwise the defendant would not make any payments on account of shipments. The seller conformed to this request and thereafter, and on the first,

twelfth, twentieth and twenty-ninth of August and the third of September respectively, on applications on such forms, the carrier, the Long Island Railroad Company, issued five bills of lading, each for a tank car of oil consigned from this plant, to the order of the defendant at the Union Stock Yards, Chicago, with a notation to notify Swift & Co., and designating the defendant as the shipper. The oil was shipped accordingly and the bills of lading were presented to the defendant and it made advances thereon or on some of them to the seller and forwarded them with drafts annexed for the full purchase price to be paid by Swift & Co. on delivery of the bills of lading. The defendant collected the drafts and credited the net proceeds less any advances theretofore made thereon, on an existing indebtedness owing by the seller to it. It does not appear that when the defendant suggested the change in the forms of the bills of lading it was aware that the seller contemplated diverting this oil from the plaintiff, and the reasonable inference is that the change was suggested solely with a view to protecting itself against a possible delivery of the oil without presentation of the bills of lading and payment of the drafts annexed on account of same, on all of which it had made advances to the seller, but when these bills of lading came to the defendant in this form the oil was under its control (*Furman* v. *Union Pacific R. R. Co.*, 106 N. Y. 579), and in forwarding the bills of lading to Swift & Co. it participated in the diversion thereof and appropriated the proceeds with the full knowledge that the oil belonged to the plaintiff. There is also evidence warranting the inference that owing to the fact that plaintiff was insisting upon credits on the drafts to the extent of one-half the amount on account of the advance of the $25,000, as it had a right to do under the contract after June 30, 1914, the defendant at the request of the seller had negotiated the sales to Swift & Co.

On the 17th of August, 1914, on application by the seller in like form, the carrier issued bills of lading for two other tank cars of oil consigned to the order of the seller at the Union Stock Yards, Chicago, with a notation to notify Swift & Co., and designating the seller as the shipper. Although by the forms of the bills of lading these two cars were not under the control of the defendant the bills of lading passed through its

hands and it appropriated the proceeds in the same manner, after it was chargeable with knowledge by the other bills of lading, issued in its own name and to its own order, that the seller was diverting the oil from the plaintiff.

It is contended in behalf of the defendant that the title to the oil never passed to the plaintiff and that, therefore, there could be no conversion thereof. With respect to two of the shipments the plaintiff furnished its own cars as contemplated and the oil was delivered therein, and the cars instead of being shipped to the plaintiff were shipped to Chicago and delivered to Swift & Co. Surely the delivery into the cars furnished by the plaintiff must be deemed a delivery to the plaintiff, and neither the seller nor the defendant can be heard to say, in effect, that the seller had appropriated the plaintiff's cars before it pumped the oil into them and that, therefore, they were its own cars. It is quite clear, therefore, that there was a conversion of the two cars and that the defendant, with the full knowledge of the plaintiff's title, participated therein. Consequently it is equally liable with the seller. It is not essential that a motive be shown to induce the action of the defendant in assisting its principal in converting the oil; but there is some evidence that its principal was largely indebted to it and that by thus diverting this oil it received the full purchase price to apply thereon, whereas it was only at liberty in the first instance to draw on plaintiff for *part* of the purchase price and until the plaintiff was reimbursed for the advance payment made by it only twelve and one-half cents per gallon was payable by it on the first drafts. I am of the opinion that by the express terms of the contract there was a delivery of the oil to the plaintiff and that title passed when it was pumped into the storage tanks. The identification was then complete and it became the duty of the seller to hold the oil for the plaintiff or to ship it to the plaintiff in the event that the quantity on hand amounted to 15,000 barrels. It does not appear how many barrels were on hand at any one time, and, therefore, it cannot be assumed that the quantity of oil amounted to that number of barrels. Until the Marden, Orth & Hastings Company exercised the option the plaintiff's title was, doubtless, subject to the exercise thereof. But as already stated the

option did not concern the oil in question and none of it was taken in the exercise of the option.

Section 156, subdivision 4, of the Personal Property Law (Consol. Laws, chap. 41 [Laws of 1909, chap. 45], as added by Laws of 1911, chap. 571) provides, among other things, as follows:

" Goods are in a ' deliverable state ' within the meaning of this article when they are in such a state that the buyer would, under the contract, be bound to take delivery of them."

Section 86 of the Personal Property Law (as added by Laws of 1911, chap. 571) provides:

" 1. The goods which form the subject of a contract to sell may be either existing goods, owned or possessed by the seller, or goods to be manufactured or acquired by the seller after the making of the contract to sell, in this article called ' future goods.'

" 2. There may be a contract to sell goods, the acquisition of which by the seller depends upon a contingency which may or may not happen.

" 3. Where the parties purport to effect a present sale of future goods, the agreement operates as a contract to sell the goods."

Section 100 of the Personal Property Law (as added by Laws of 1911, chap. 571) provides:

" Rule 4.  1. Where there is a contract to sell unascertained or future goods by description, and goods of that description and in a deliverable state are unconditionally appropriated to the contract, either by the seller with the assent of the buyer, or by the buyer with the assent of the seller, the property in the goods thereupon passes to the buyer.  Such assent may be expressed or implied, and may be given either before or after the appropriation is made."

By virtue of the precise terms of this contract, and the uncontroverted facts the case is, I think, brought clearly within the provisions of the Personal Property Law quoted; and the intention of the parties, which governs as to when title was to pass (*Cornell* v. *Clark*, 104 N. Y. 455; *Burrows* v. *Whitaker*, 71 id. 296), plainly was, I think, that the title was to pass when the oil was pumped into the storage tanks.

The only authority on which the defendant relies, which is not manifestly distinguishable on the facts, is *Comfort* v. *Kiersted* (26 Barb. 472); and that is distinguishable on the ground that therein there was not a sale of *all* the shingles the seller made during a season or during a specified time or even the *first* shingles made, but of a *specified quantity*, and, therefore, until there was an actual or *constructive* delivery the purchaser could not claim any *particular shingles.* Whereas, here the contract was for *all* the fish oil of the specified description manufactured by the seller during the period specified, and of course the seller thereafter could confer title on no one else with respect to any of it.

It follows that the plaintiff's exception to the direction of the verdict should be sustained and a new trial granted, with costs to the plaintiff to abide the event.

CLARKE, P. J., DOWLING and MERRELL, JJ., concurred; SMITH, J., dissented in part.

SMITH, J. (dissenting in part):

In January, 1914, the plaintiff made a contract with the Atlantic Phosphate and Oil Corporation, a manufacturer of fish oil, for its entire product for the year 1914, with the exception of 6,000 barrels, or as much thereof as might be demanded, which the said oil corporation had agreed to give to Marden, Orth & Hastings Company. The contract provided that the purchaser should receive the oil in the purchaser's tank cars, to be supplied by the purchaser at the seller's said factory at Promised Land, or, at the purchaser's option, from time to time, in purchaser's barrels to be furnished by the purchaser at the said factory at Promised Land. It was further provided that the purchaser should provide enough tank cars or barrels at the factory as aforesaid to take and receive all said oil as and when produced by the seller, except as thereinafter provided. It was thereinafter provided that when the said oil is produced by the seller at its factory it shall be invoiced to the purchaser by Marden, Orth & Hastings Company, the agent of the seller, and provision is made for the drawing of drafts as against the purchase price. Later the contract provides:

" If at any time there shall not be at the factory sufficient tank cars or barrels furnished by the Purchaser to receive all the oil as fast as produced, the Seller shall store the said oil in its own tanks at its factory, and Marden, Orth & Hastings Company shall invoice the oil so soon as stored in said tanks to the Purchaser, and shall be entitled to draw on the Purchaser at sight, at the same rate of twenty-five cents a gallon for the said oil so stored in storage tanks, as well as for the oil placed in said tank cars or barrels; provided, however, that if at any time the oil so stored in the Seller's storage tanks shall reach the amount of fifteen thousand barrels, and there shall not be enough tank cars or barrels provided by the Purchaser to take care of all excess as fast as produced, the Seller may ship such excess oil to the Purchaser or store the same in any way that may be possible, and the Purchaser in that event shall pay to the Seller any extra expenses thus incurred by the Seller."

The defendant was the factor under an agreement for the sale of this oil of the Atlantic Phosphate and Oil Corporation. The defendant had advanced substantial sums of money to that corporation, and in order to protect the defendant for its commissions and for the advances, the drafts drawn on the plaintiff for the oil shipped were delivered to and collected by the defendant. Thereafter, by the direction of the defendant, the Atlantic Phosphate and Oil Corporation shipped six carloads of the oil to Swift & Co., and it is for the conversion of these six carloads of oil by the defendant that this action is brought.

Of these six carloads, four were taken direct from the tanks of the Atlantic Phosphate and Oil Corporation and put upon the cars of Swift & Co., and thus forwarded to Swift & Co. The other two carloads had been taken from the tanks by the Atlantic Phosphate and Oil Corporation and put upon the cars belonging to the plaintiff, and the oil in these cars belonging to the plaintiff was shipped to Swift & Co. As to the oil taken directly from the tanks of the Atlantic Phosphate and Oil Corporation and put upon the cars of Swift & Co., I do not think the defendant can be held for conversion, although it participated in a diversion of this oil. The defendant can only

be held for conversion provided title had passed from the Atlantic Phosphate and Oil Corporation to the plaintiff.

In the manufacture of this oil, the evidence shows that the method of manufacture was to cook the fish which were not otherwise fit for eating, and then through presses the oil was pressed out and turned into tanks, where the oil was further cooked; that thereafter the oil is turned into settling tanks and given a chance to clear, and that after it is cleared the oil is finally pumped into the storage tanks, where it stays until it is loaded upon the car, so that the placing of this oil in the storage tanks was only the last step in the process of manufacture. It would of necessity have been run into these storage tanks, whether or not it was sold to the plaintiff, or whether or not it was sold to any one. All of the oil was run into these storage tanks from the settling tanks, in order that the settling tanks might be used for further oil that was in process of manufacture.

By section 86 of the Personal Property Law (Consol. Laws, chap. 41 [Laws of 1909, chap. 45], as added by Laws of 1911, chap. 571) it is provided that " 1. The goods which form the subject of a contract to sell may be either existing goods, owned or possessed by the seller, or goods to be manufactured or acquired by the seller after the making of the contract to sell, in this article called ' future goods.' * * * 3. Where the parties purport to effect a present sale of future goods the agreement operates as a contract to sell the goods."

Section 99 of that law (as added by Laws of 1911, chap. 571) provides: " Property in specific goods passes when parties so intend. 1. Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred. 2. For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case."

Section 100 (as added by Laws of 1911, chap. 571) purports to give the rules for ascertaining intention, and by rule 4 it is provided: " 1. Where there is a contract to sell unascertained or future goods by description, and goods of that description and in a deliverable state are *unconditionally*

*appropriated* to the contract, either by the seller with the assent of the buyer, or by the buyer with the assent of the seller, the property in the goods thereupon passes to the buyer.   Such assent may be expressed or implied, and may be given either before or after the appropriation is made."

These provisions of the Personal Property Law were taken from the Uniform Sales Act which had been enacted in many States, including Connecticut, New Jersey, Massachusetts, Rhode Island and Ohio, as early as 1909.   In Williston on Sales at Common Law and under the Uniform Sales Act, Professor Williston, in speaking of rule 4, says (at p. 380): " As an original question it might be well urged that when a contract is made for the sale of unspecified goods, the property should pass unless a contrary intention is manifested, as soon as the goods become specified and put in a deliverable condition by the seller.   It is well settled, however, that the property does not pass at so early a moment.   Some subsequent act in regard to the goods is necessary as a manifestation of the intent to transfer it.   The intention alone is not enough, and certainly unless clearly so agreed, the completion of the goods is not a sufficient manifestation of intention by outward act. There is not much authority upon the question whether the parties, if they expressly so agree, may vary the rule that the property does not pass on the mere completion of the goods. In other words, it is not clear whether the rule that the property does not pass until some subsequent act of appropriation is one of presumption based perhaps on supposed intention, or whether it is an absolute rule of law.   In theory there seems no reason why the intention of the parties should not prevail if it is clearly manifested and some authority supports this view.   The completion of the goods is itself an outward act, which it would seem might be agreed upon as the appropriation. As a general rule, however, some act of appropriation of the goods to the buyer, other than mere completion or preparation, is essential and for the transfer of the property, and it is necessary that the act of appropriation should be assented to by both parties.   But as in the formation of contractual agreements generally, it is immaterial that the parties express their assent at different times, nor is it material which party makes the proposition."

In McKinney's Consolidated Laws of New York, Annotated (Personal Property Law, p. 169), in speaking of this rule, it is stated: "Rule 4, paragraph 1, is in accord with the common law of this State, with the possible exception noted below relating to the forcing of title on a buyer by means of tender."

At page 161 of his work, Professor Williston, in speaking of the sale of future goods, says: "But the mere acquisition of the goods by the seller does not, it seems, in our law operate as a transfer of title to the buyer even though the parties intend that it should be so." In this authority is cited the case of *Low* v. *Pew* (108 Mass. 347), and the footnote reads: " In the latter case fishermen purported to ' sell, assign and set over   *   *   * all the halibut that may be caught by the master and crew of the schooner *Florence Reed* on the voyage upon which she is about to proceed.' While the schooner was upon her voyage the fishermen became bankrupt, and it was held that their assignees in bankruptcy had title to the fish that had been caught, as against the buyer."

In *Andrews* v. *Durant* (11 N. Y. 35) Judge Denio says: " In general a contract for the building of a vessel or other thing not yet *in esse*, does not vest any property in the party for whom it is agreed to be constructed during the progress of the work, nor until it is finished and delivered, or at least ready for delivery and approved by such party. All the authorities agree in this. [Citing authorities.] And the law is the same though it be agreed that payment shall be made to the builder during the progress of the work, and such payments are made accordingly. In *Mucklow* v. *Mangles* [1 Taunt. 318], which arose out of a contract for building a barge, the whole price was paid in advance, the vessel was built and the name of the person who contracted for it was painted on the stern, yet it was held that the title remained in the builder."

In *Comfort* v. *Kiersted* (26 Barb. 472) it was held: " Where an article agreed to be sold is yet to be manufactured, the title does not pass until there has been some act on the part of the vendor which amounts to a delivery, and some act on the part of the vendee which amounts to an acceptance." In writing for a unanimous court, Justice Harris there says: " In this case, the parties to the contract had agreed that

the shingles should be the property of the defendants *as fast as they were made.* Still the contract was executory. To make a sale complete, so as to vest the title in the vendee, the thing sold must not only be in existence, but it must be identified. The contract itself conveyed no present right of property to the defendants. Though Davis agreed that the shingles he was about to make should, as fast as made, become the property of the defendants, still, as it was an agreement to be executed *in futuro,* his right was, not to the shingles, but in action for not executing the agreement. Before the title would vest, even after the shingles had been made, something must have been done which would amount at least to a constructive delivery. The shingles must have been in some way designated and set apart, so as to be capable of being identified as the property of the purchasers. [Citing cases.] "

In *Andrew* v. *Newcomb* (32 N. Y. 417) it was held that the title to growing crops could pass as soon as the crops came into existence, but the court states this rule as an exception to the general rule, that title to property not in existence cannot be affected so as to vest the title when it comes into being. Even this rule has been limited in the case of *Rochester Distilling Company* v. *Rasey* (142 N. Y. 570) which recognizes as between a tenant and a third party that the title to the crops would not pass without a subsequent act of appropriation. (See, also, *Hart* v. *Taylor,* 82 N. Y. 376; *Deeley* v. *Dwight,* 132 id. 59; *Atlantic Building Supply Co.* v. *V. P. Cement Co.,* 203 id. 133.)

Under these authorities, I am unable to find any act of the vendor which constitutes an unconditional appropriation of this oil to the plaintiff's contract. Nothing was done with the oil except what was necessary to do in the completion of the process of manufacture. The oil that was in these tanks belonged in part to Marden, Orth & Hastings Company, if they chose to exercise their option to purchase the same. It is stipulated in the case that they did exercise their option, but by the stipulation it is stated that that option was exercised during " that period." That period is the period provided in their contract with the American Phosphate and Oil Corporation, which was one year from the 15th day of December, 1913, so that in August, 1914, it does not appear

that Marden, Orth & Hastings Company had exercised their option to take any part of that oil. For aught that appears, their 6,000 barrels provided for in their contract may all have been in those tanks at the time of the alleged conversion, and thereafter taken. It is argued, because by plaintiff's contract a draft might be drawn upon the plaintiff for twenty-five cents a gallon, while the oil was still in the storage tanks, that this provision indicates an intention that title shall pass at once when the property gets into the storage tanks. It will be noticed, however, that these drafts are to be drawn by Marden, Orth & Hastings Company, which firm had its option to withdraw 6,000 barrels of oil at any time from those tanks, so that this clause of the contract is not sufficient to indicate the intention of the parties that title shall pass at once upon production and storage in these storage tanks. In *Comfort* v. *Kiersted* (*supra*) the opinion discusses this very situation and Justice HARRIS writes: " Suppose Davis had made, with another person, another contract, in all respects like that under consideration, whereby he had agreed to deliver the same quantity of shingles as fast as made, could it be pretended that the defendants would, by the mere operation of their contract, become the owners of all the shingles made by Davis, as soon as manufactured? It would then need, as now, that in some way the shingles should be designated as delivered in execution of the contract, in order to change the right of property. And they would then have become the property of the one or the other of the parties to whom he had agreed to sell them, according to their designation." So, under the contract here to sell to Marden, Orth & Hastings Company 6,000 barrels of the oil at their option, the placing of the oil in these storage tanks could not in any way be deemed an appropriation to the plaintiff's contract, and much less, with the right of Marden, Orth & Hastings Company to take therefrom 6,000 barrels of oil, could it be deemed to be an *unconditional appropriation* to the plaintiff's contract, which unconditional appropriation is made by the Personal Property Law a requisite to the passing of title of future goods. If placing this oil in these storage tanks could in any event be deemed a delivery, it was a conditional delivery, conditioned upon the election of Marden, Orth &

Hastings Company to take 6,000 barrels thereof for their own purposes.

As to the oil which had been placed in the cars of the plaintiff, it seems to me clear that the Atlantic Phosphate and Oil Corporation had so far made an unconditional appropriation of that oil to the plaintiff's contract as to vest title in the plaintiff. That the defendant had full knowledge of that contract, I have no doubt whatever. It had loaned to the Atlantic Phosphate and Oil Corporation a large amount of money. Confessedly, the contract was shown to one of the officers of the defendant, with every presumption that it was read, as it was to their interest to read the contract and become acquainted with its conditions. Moreover, the defendant discounted drafts drawn by the Atlantic Phosphate and Oil Corporation upon the plaintiff for oil delivered under this contract, and discounted the drafts for the $25,000 advanced by the plaintiff to the Atlantic Phosphate and Oil Corporation, and it is against all probability that this was done without a substantial knowledge of the plaintiff's rights in this oil. In fact, the course of business of the Atlantic Phosphate and Oil Corporation seems, during all this time, to have been dictated by the defendant, which had so large an interest in the company by reason of moneys advanced. Inasmuch as the title to this oil in these cars had passed to the plaintiff, the defendant was guilty of conversion in directing a diversion of this oil from the plaintiff to Swift & Co.; and as to this oil, the exceptions must be sustained, and a new trial ordered, with costs to plaintiff to abide the event.

Exceptions sustained and motion for new trial granted, with costs to plaintiff to abide event. Order to be settled on notice.